**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 23-cr-269 (TJK)** |
| | : | |
| **JOSHUA KALEB YOUNGERMAN,** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES' OPPOSITION TO DEFENDANT'S**
**MOTION TO SUPPRESS STATEMENTS**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Opposition to defendant Joshua Kaleb Youngerman's Motion To Suppress Statements.   ECF No. 33 ("Mot.").   On January 6, 2021, the defendant joined a riot at the U.S. Capitol.   He scaled a wall to get to the Upper West Terrace, and then he breached the Capitol building itself.   When law enforcement first interviewed him, he chose to lie about his conduct.   Later, when he was arrested based on that conduct, he signed a *Miranda* waiver and voluntarily answered questions for a brief period of time, before deciding when he wanted to stop answering questions.   Through his motion, the defendant seeks to suppress and conceal his false statements from the jury in this case.   Because both interviews were voluntary, and the second interview was subject to a *Miranda* waiver, the Court should deny the motion.

**BACKGROUND**

**I.      The Defendant's January 6, 2021 Conduct**

Over 1,400 individuals have been charged thus far in connection with the attack on the U.S. Capitol on January 6, 2021.   Defendant Joshua Kaleb Youngerman worked with and

coordinated with others in California in anticipation of the January 6, 2021 riot.   *See* ECF No. 1. Among other means, Youngerman coordinated with others in California through the DC Brigade Telegram group—a Telegram group run by Russell Taylor that was, by its own terms, organized as a "group of fighters" preparing for January 6, 2021.   *See* Statement of Offense, *United States v. Russell Taylor*, 21-cr-392-2, ECF No. 197 at ¶ 18 (D.D.C. Apr. 19, 2023).   On January 6, 2021, Youngerman unlawfully entered Capitol grounds, climbed a wall at the Capitol, and ultimately entered the U.S. Capitol building.   *See id.*   After the riot, Youngerman celebrated what he and the mob had accomplished, writing on Twitter, "I am in full support of storming and occupying the Capital from the inside and out.   That was the original intent for many.   We came to claim back our house."   *Id.*

## II.   The Defendant's June 28, 2021 Interview

On June 23, 2021, the FBI attempted to interview of Youngerman at his residence in Southern California.   The FBI was not able to speak with Youngerman at that time, but spoke with his mother, who provided a phone number for him.   The next morning, on June 24, 2021, Youngerman's father called the FBI San Diego Field Office and stated that Youngerman wanted to speak to figure out why the FBI was looking into him.   That same day, Youngerman, on his own accord, voluntarily came to the FBI San Diego Field Office and requested to speak with the agent who had attempted to interview him.   Youngerman was informed that the case agent would likely reach out to him the following day.   The next day, on June 25, 2021, the case agent called Youngerman and scheduled an interview at the FBI San Diego Field Office for June 28, 2021.

As agreed, on June 28, 2021, the FBI conducted a voluntary interview of Youngerman at the FBI San Diego Field Office.[1]   Youngerman arrived alone and was interviewed in an FBI interview room by the case agent and another special agent.   He was never placed under arrest or told he could not leave the interview.   The tone of the interview was casual, conversational, and friendly.   In fact, at the time of the interview, the FBI had not identified footage of Youngerman entering the Capitol building.   The FBI was interviewing Youngerman, in significant part, because of his association with a broader group from California that had recently been charged with, inter alia, Conspiracy To Obstruct an Official Proceeding, related to their obstruction of the certification proceeding on January 6, 2021.   *See United States v. Hostetter, et al.*, 21-cr-392.

During the interview, Youngerman told the FBI that he originally heard about the January 6, 2021 rally in Washington, D.C. through Twitter.   Youngerman told the FBI that he knew Russell Taylor from local protests in Southern California.   Youngerman confirmed that Taylor had invited Youngerman into multiple Telegram groups that discussed coordination for January 6, 2021.   Among these Telegram groups, Youngerman characterized the DC Brigade Telegram group as a group to discuss safety of protestors against counterprotestors.   Youngerman told the FBI that, weeks prior to January 6, 2021, he was aware of online discussions about marching to the U.S. Capitol building.   Youngerman also discussed meeting an individual at a local protest in California who discussing rushing the U.S. Capitol.   Youngerman stated that he exchanged telephone numbers with this individual, as well as text messages.   Youngerman told the FBI that, on January 6, 2021, he was with his friend, Robert Colello, *see United States v. Robert Colello*,

---

[1]  The defendant notes that "[n]o recording of this conversation was provided to the defense." Mot. at 2.   The defense never asked the United States prior to filing the instant motion, but the United States would have confirmed, as it confirms here, that this interview was not recorded.

24-cr-59 (JMC), and that the two attended the "Stop the Steal" rally and listened to then-President Donald Trump speech.    Youngerman said he and Colello then walked to the U.S. Capitol, where they observed chemical munitions being deployed and rioters climbing the building. Youngerman claimed he and Colello stayed in the area for approximately 30 minutes. Youngerman stated that neither he, nor Colello, entered the U.S. Capitol building.    Youngerman was never taken into custody and left at the conclusion of the interview.

### III.    The Defendant's July 25, 2023 Arrest and Interview

On July 25, 2023, the defendant was arrested by the FBI, pursuant to an arrest warrant. ECF No. 5.    During the arrest, the defendant was handcuffed and placed in the back of a patrol vehicle.    He was informed of the arrest warrant and the search warrant.    The defendant was given water and allowed to use his vape pen.

The defendant spontaneously told agents that he did not want to speak unless he had a lawyer present.    Agents did not ask the defendant questions regarding the substance of the case following that communication.    Less than one hour later, at or near the patrol vehicle, the defendant asked to speak to his parents.    The agents allowed him to do so, as long as the phone was placed on speaker mode.    The case agent informed the defendant's parents of the charges on the arrest warrant.    While the defendant was speaking to his father, his father told him he could speak to agents provided he did not say anything incriminating, to which the defendant appeared to assent.    After speaking with his parents, the defendant changed his mind, and agreed to be interviewed by the agents.    The agents recorded the following colloquy with the defendant:

> SPECIAL AGENT 1: Today is July 25th.    The time is 12:07.    Special Agent Erica Price.    Special Agent Kelsey Randall are present with subject Joshua Youngerman.

SPECIAL AGENT 2: Hi.

YOUNGERMAN: Hi.

SPECIAL AGENT 2: So, I know originally at 7-Eleven you said you didn't want to speak to us without an attorney present.   Totally your right to do so.   Then after your conversation with dad, kind of seemed like you were—dad said to give a little bit of information—

YOUNGERMAN: I'll give a little bit.

SPECIAL AGENT 2: OK.   So you're willing to speak to us, even after you originally said—

YOUNGERMAN: Yeah.

SPECIAL AGENT 2: OK.   And again, during that conversation we'll read you your rights.

YOUNGERMAN: OK.

SPECIAL AGENT 2: We'll make sure you fully understand all of that.

YOUNGERMAN: OK.

SPECIAL AGENT 2: And again, during the conversation if you don't want to answer any questions totally your right to do so.

YOUNGERMAN: OK.

SPECIAL AGENT 2: You don't have to.[2]   Ah.   OK.   So then—we are going to take you just so that you're more comfortable so you're not sitting here in the back of this tiny vehicle, we're going to take you down to the Sherriff's office, down in Imperial County somewhere, ah—

UNKNOWN: It's just down on the street.

---

[2]  This transcript represents the best effort of the undersigned the capture the exchange.   It has certain differences from the transcript provided by the defendant.   *See* ECF No. 33 at 2–3.   For example, the defendant's transcription omits this reiteration from the special agent: "You don't have to."   *Id.*   The best evidence is the recording itself, which has been provided to the Court as Defendant's Exhibit A.

SPECIAL AGENT 2: Yeah, it's not a far drive.    And then, so we'll meet with you there and we'll discuss then.

YOUNGERMAN: OK.

*See* Defendant's Exhibit A.

A few minutes later, the defendant was transported to the Imperial Beach Police Station

for an interview.    The interview was recorded and began with the following exchange:

SPECIAL AGENT 2: OK.   It is July 25th, 2023.   It is approximately 12:20 pm east— or Pacific Standard Time.  Present is Special Agent Kelsey Randall and Erica Price and then Joshua Youngerman.

YOUNGERMAN: Mm.

SPECIAL AGENT 2: As previously mentioned, um, we picked you up at 7-Eleven. Um—wanna ask if, um, Devin can uncuff him.

UNKNOWN: Yeah.

SPECIAL AGENT 2: Um, we picked you up at 7-Eleven.   You told us there that you didn't want to speak to us without an attorney.   Um, and then when we let you speak with your father on the phone, and he said, you know, certain questions you're more than welcome to answer without an attorney.

YOUNGERMAN: Mm.

SPECIAL AGENT 2: We asked you again, if that is indeed what you want, you said, yes, you'd be willing to speak to us up to a certain extent, uh, so we brought you down here in order to do so.

YOUNGERMAN: Mm.

SPECIAL AGENT 2: Um, I have shown you the arrest warrant, went over your charges with you.

YOUNGERMAN: Mm.

SPECIAL AGENT 2: And your father.  Um, and then, so Erica is going to go ahead and get started with some of your basic information, just to confirm.

Government Exhibit 1 (0:00–1:02).[3]

After collecting the background biographical information, the agents went through the Advice of Rights form with the defendant.[4]   The "Advice of Rights" form states, "Before we ask you questions, you must understand your rights."   Government Exhibit 2.   The form identifies the following specific rights:

> You have the right to remain silent.
>
> Anything you say can be used against you in court.
>
> You have the right to talk to a lawyer for advice before we ask you any questions.
>
> You have the right to have a lawyer with you during the questioning.
>
> If you cannot afford a lawyer, one will be appointed for you before any questions if you wish.
>
> If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

*Id.*   The defendant signed his initials next to each one of these rights.   *Id.*   Below these rights, there is a section labeled "CONSENT."   *Id.*   That section reads, "I have read this statement of

---

[3] For the substantive interview, the defendant has provided only a partial transcript.   *See* Defendant's Exhibit B.   The United States has independently sought to transcribe relevant portions of the interview.   But, here too, the best evidence is the recording itself, which the United States provides as Government's Exhibit 1.

[4] The defendant's motion entirely omits the defendant signing the advice of rights form.   Instead, the motion falsely states, "After taking Mr. Youngerman to the Sheriff's station, agents Randall and Price interrogated Mr. Youngerman.   They did not scrupulously honor his initial request for an attorney.   *They did not immediately re-read him his rights.*"   Mot. at 3 (emphasis added). This is patently incorrect.   On October 10, 2023, defense counsel was provided in discovery the interview report for this interview, the recording of this interview, and the Advice of Rights form signed by the defendant.   Defense counsel was also provided, at the same time, minutes from his arrest and interview, which explicitly note that the defendant was read his Advice of Rights and provided consent to be interviewed.   The defendant's motion appears to cherry-pick, without explanation, bits and pieces of the interview, undermining his own recitation of the facts.

my rights and I understand what my rights are.   At this time, I am willing to answer questions

without a lawyer present."   *Id.*   The defendant signed the form.   *Id.*

The FBI also walked through the Advice of Rights form with Youngerman and obtained

his consent on the recording.   In pertinent part, the defendant had the following exchange with

the special agent interviewing him:

> SPECIAL AGENT 1: Like she said, before we get started, we just want to review
> your rights with you.   Today's the 25th.   All right.   So we're gonna walk
> through each one and I'm just gonna make sure you understand.   Before we ask
> your rights, we have to understand them.   So you have the right to remain silent.
> Do you understand that?
>
> YOUNGERMAN: Mhm.
>
> SPECIAL AGENT 1: OK, can you just initial next to it?
>
> YOUNGERMAN: All right.
>
> SPECIAL AGENT 1: Just go ahead and [inaudible].   Anything you say can be
> used against you in court.   Do you understand that?
>
> YOUNGERMAN: Yeah.
>
> SPECIAL AGENT 1: All right.   You have the right to talk to a lawyer for advice
> before we ask you any questions.
>
> YOUNGERMAN: Yes.
>
> SPECIAL AGENT 1: OK.   You have the right to have a lawyer with you during
> the questioning.
>
> YOUNGERMAN: Yeah.
>
> SPECIAL AGENT 1: If you cannot afford a lawyer, one will be appointed for you
> before any questioning if you wish.
>
> YOUNGERMAN: [Inaudible.]

SPECIAL AGENT 1: If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.   Do you understand all of these rights?

YOUNGERMAN: Yes.

SPECIAL AGENT 1: OK.   I want you to read this out loud to me.

YOUNGERMAN: I have read this statement of my rights and I understand what my rights are.   At this time, I am willing to answer questions without a lawyer present.

SPECIAL AGENT 1: Are you willing to do so?

YOUNGERMAN: Yes.

SPECIAL AGENT 1: All right, just sign there.   Thank you.   Perfect.

*See* Government Exhibit 1 (1:53–3:40).

    In the interview, the defendant told the FBI that he decided about a month prior to January 6, 2021, to attend the rally in Washington D.C.   The defendant stated he heard about the January 6, 2021 event through Twitter, in posts by then-President Trump.   The defendant told the FBI that Robert Colello traveled to Washington, D.C. with him—albeit on a different flight—and that he had coordinated his travel with others through Telegram and text messages.   He stated that another individual had purchased his flight.   The defendant told the FBI his activities in Washington, D.C. on January 5, 2021.   He told the FBI, on the morning of January 6, 2021, that he met up with a group from California and headed to the "Stop the Steal" rally at the National Mall.   The defendant said he heard then-President Trump and Rudy Giuliani speak.   After the rally, the defendant said he and Colello went back to their hotel, and then he received a call or text informing him that "they were marching over to the Capitol."   After that message, the defendant and Colello

went to the Capitol.   Throughout, the defendant and the interviewing agents were cordial with

each other and talked about, among other matters, the defendant's educational and career plans.

Overall, the interview lasted approximately 30 minutes.   *See* Government Exhibit 1.

Notably, when the defendant did not want to continue answer questions, he said so.

SPECIAL AGENT 1: And so you're walking that way and then when do you start to realize, like, oh, there's a lot of people, like, people, and you see—

YOUNGERMAN: I think it was right when we turned a corner and I saw the huge crowd of people there.   That's when I was like, OK, this—there's a ton of people here.

SPECIAL AGENT 2: And what was that crowd like?

YOUNGERMAN: Um, I don't remember.   I don't remember—

SPECIAL AGENT 2: OK.

YOUNGERMAN: —what their demeanor was.

SPECIAL AGENT 1: And then what happened from there?

YOUNGERMAN: Um, and then from there, I think that part I would want, would rather have an attorney present.

SPECIAL AGENT 1: OK.

YOUNGERMAN: For anything after that.

SPECIAL AGENT 2: Sure.

SPECIAL AGENT 1: Um, all right.    Um, so going back to the Telegram—

SPECIAL AGENT 2: I just want to clarify.    Do you not want to speak further or just that question?

YOUNGERMAN: I—that question.   [Inaudible.]

SPECIAL AGENT 1: Yeah, any time you don't want to answer a certain question, just tell us.

YOUNGERMAN: OK.

SPECIAL AGENT 1: And then we'll go from there.

 . . . .

SPECIAL AGENT 2: So you said you turned a corner and you saw a huge crowd of people.

YOUNGERMAN: Mhm.

SPECIAL AGENT 2: You couldn't remember what their demeanor was like.

YOUNGERMAN: Yeah.

SPECIAL AGENT 2: Um, and then, I forget, do you remember what you asked that he says he doesn't want—

SPECIAL AGENT 1: I think it was—

YOUNGERMAN: I think you asked what happened like beyond—

SPECIAL AGENT 1: Like what happened from there.

SPECIAL AGENT 2: OK, so—

YOUNGERMAN: Yeah.  I think that anything, honestly, anything beyond the story I would like to have an attorney present.

SPECIAL AGENT 2: OK, so then we'll stop, we'll stop questioning there.

YOUNGERMAN: Yeah.

SPECIAL AGENT 2: I'm totally fine with that.   I do just want to show you a picture, just to verify the clothing that you were potentially wearing that day, that it was in fact you.

YOUNGERMAN: Uh, yes, that's me.

*See* Government Exhibit 1 (24:05–24:53; 27:01–27:45).   Following this exchange, beyond

identifying himself, Colello, and a third individual in photographs, and explaining his relationship

with Colello and the other individual beyond January 6, 2021, there were no further subsequent substantive conversations.   *See id.*

### IV.    The Charges and the Instant Motion

For his January 6, 2021 conduct, Youngerman was charged, by criminal complaint on July 24, 2023, with five misdemeanor offenses, ECF No. 1, and was arrested on July 25, 2023, ECF No. 5.   On August 10, 2023, Youngerman was charged by Information with the same five misdemeanor offenses.   *See* ECF No. 10.   On April 10, 2024, a grand jury returned a Superseding Indictment charging Youngerman with the following six offenses:

Count One:     Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512, 2.

Count Two:     Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1).

Count Three:   Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2).

Count Four:     Disorderly Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D).

Count Five:     Parading, Demonstrating, and Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

Count Six:     Stepping, Climbing, Removing, or Injuring Property on Capitol Grounds, in violation of 40 U.S.C. § 5104(d).

*See* ECF No. 24.

On June 4, 2024, Youngerman filed a motion to suppress statements.   *See* Mot.

## LEGAL STANDARD

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."   U.S. CONST. Amend. V.   To safeguard that right, the police must warn a suspect who is going to be questioned while in custody that he "has the right to remain

12

silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). While Fourth Amendment waivers need only be voluntary, *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973), a *Miranda* waiver must be both intelligent and voluntary. *Miranda*, 384 U.S. at 471–72. But this prophylactic rule applies only to custodial interrogations—which the Supreme Court defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. In other words, *Miranda*'s rule does not come into play unless the court determines that the defendant was in "custody" for this purpose.

In this context, "'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *United States v. Burden*, 934 F.3d 675, 161 (D.C. Cir. 2019) (quoting *Howes v. Fields*, 565 U.S. 499, 508 (2012)). There are two components to the *Miranda* custody analysis. *Howes*, 565 U.S. at 508–09. "[T]he initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* at 509. "[C]ourts must examine 'all of the circumstances surrounding the interrogation'" to determine if the subject's "freedom of movement was curtailed." *Id.* (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam) (finding an officer's intent to restrict the liberty of a suspect is only relevant on the custody issue if it is "conveyed, by word or deed, to the individual being questioned")). Factors relevant to this analysis include: (1) the location of the interview; (2) its duration; (3) statements made during the interview; (4) any use of physical restraints during the

interview; and (5) whether the person was released at the end of the interview.   *Howes*, 565 U.S. at 509 (collecting cases).   If the individual would have felt free to leave, the inquiry ends; a restraint on freedom of movement is a prerequisite for *Miranda* custody.   *See Maryland v. Shatzer*, 559 U.S. 98, 112 (2010); *see also United States v. Petersen*, 506 F. Supp. 2d 21, 23 (D.D.C. 2007) (holding that it is the defendant who bears the burden of proving custody by a preponderance of the evidence).

But "[b]ecause not all restraints on freedom of movement amount to custody for purposes of *Miranda*, a finding that a person in the suspect's shoes would not have felt free to leave does not end the inquiry."   *United States v. Cooper*, 949 F.3d 744, 748 (D.C. Cir. 2020) (quoting *Howes*, 565 U.S. at 509) (cleaned up).   The second step is to ask "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."   *Howes*, 565 U.S. at 509; *see also Maryland v. Shatzer*, 559 U.S. 98, 112 (2010) (explaining that "the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody").   Coercive pressures include "the shock" of being arrested and questioned after being "yanked from familiar surroundings in the outside world" and "cut off from his normal life and companions"; "the hope" that speaking will allow the interviewee "to leave and go home"; and a reason to think that the interrogating officers have "authority to affect the duration" of the interviewee's confinement.   *Howes*, 565 U.S. at 511–12 (quoting *Shatzer*, 559 U.S. at 106).

But even for custodial interrogations, a suspect who wishes to invoke his rights must do so unambiguously.   *See Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) ("There is good reason to require an accused who wants to invoke his or her right to remain silent to do so unambiguously.");

*Davis v. United States*, 512 U.S. 452, 461–62 (1994) ("If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him."). This requirement "results in an objective inquiry that avoids difficulties of proof and provides guidance to officers on how to proceed in the face of ambiguity." *Berghuis*, 560 U.S. at 381. Where a suspect says something ambiguous or equivocal, it is not only permissible but often "good police practice" to clarify whether he wants to invoke his rights. *Davis*, 512 U.S. at 461; *accord Berghuis*, 560 U.S. at 381. An accused who has invoked his right to counsel may, nonetheless, subsequently be questioned if he "initiates further communication, exchanges, or conversations with the police" and subsequently waives the right. *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). Where the suspect decides to talk, his statements may be admitted without violating the Fifth Amendment if the government shows by a preponderance of evidence that he knowingly, intelligently, and voluntarily waived his rights. *See Colorado v. Connelly*, 479 U.S. 157, 168–69 (1986).

## ARGUMENT

The defendant's motion to suppress is without merit, as to both the June 28, 2021 and the July 25, 2023 interviews.

### I.    The June 28, 2021 Interview Was Noncustodial and Voluntary.

The defendant's motion to suppress his June 28, 2021 statements fails because he cannot make the threshold showing that he was in custody during the interview. "[I]t makes sense for a court to begin any custody analysis by asking whether a reasonable person would have thought he was free to leave the police encounter at issue. If the answer is yes, the *Miranda* inquiry is at an end; the challenged interrogation did not require advice of rights." *United States v. Newton*, 369

F.3d 659, 672 (2d Cir. 2004).   Here, because the interview was noncustodial, the defendant's motion must be denied.

There is nothing in the circumstances present in the July June 28, 2021 interview that supports the idea that the defendant was in custody and not free to leave.   The defendant was interviewed at the FBI's offices after he had already voluntarily presented himself at that location, after the FBI attempted an interview at his home.   The interview was scheduled at a time and location convenient for the defendant.   He appeared for his interview as requested, and left without incident.   The conversation with the FBI was friendly, casual, and conversational.   The defendant answered questions intelligently and was comfortable enough with the agents to lie to them without fear.   The defendant was never placed under arrest.   While being interviewed by police can always produce anxiety, the operative inquiry is whether the person was free to leave. He clearly was.   And he did.   In his motion, the defendant directs the Court to his subjective feelings.   Mot. at 5 ("[H]e did not feel that he could refuse.").   But the question is how a reasonable person would have understood the situation.   *See Berkemer v. McCarty*, 468 U.S. 420, 442 (1984) ("[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.").[5]   Here, under all the circumstances, a reasonable person in the defendant's position would have felt free to leave.

In return, the defendant alleges three circumstances as suggestive of a custodial environment.   First, the defense notes, "[t]he San Diego FBI Field Office is not a place the public can enter or leave on their own. . . .   Mr. Youngerman needed an escort into the office and to leave

---

[5]   While the defendant's age, to the extent it was apparent to law enforcement, is a relevant factor, *see J.D.B. v. North Carolina*, 564 U.S. 261, 272 (2011), the defendant was in no sense a child when he was interviewed; he was 21.

the office." Mot. at 5. But the Supreme Court has "explicitly recognized that Miranda warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'" *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)); *see also United States v. Patterson*, 826 F.3d 450, 456 (7th Cir. 2016) ("The fact that the interrogation took place in the FBI office conference room does not by itself establish custody."). In *California v. Beheler*, the Supreme Court specifically addressed, "whether Miranda warnings are required if the suspect is not placed under arrest, voluntarily comes to the police station, and is allowed to leave unhindered by police after a brief interview." 463 U.S. at 1121. The Supreme Court held it had been "settled clearly" that *Miranda* warning are not required under these circumstances. *Id.* at 1121–22. So too here. The defendant was never arrested at this interview, was never placed in handcuffs, and was allowed to leave without incident following it. Moreover, not only had the defendant voluntarily come to the FBI's field office; he himself had *selected* the location. In fact, the defendant came to the FBI's office not once, but twice, of his own volition, after the FBI had attempted to speak to him at his home. *See United States v. Kelsey*, 917 F.3d 740, 751 (D.C. Cir. 2019) (holding the defendant "was not in custody" where the defendant "came to the interview of his own volition" and "was not restrained in any way"); *United States v. Jonas*, 786 F.2d 1019, 1022 (11th Cir. 1986) ("In view of Guarino's voluntary appearance at the FBI office and the circumstances prevalent at the interview it must be concluded that a reasonable man in his position would not have considered himself in custody, and we conclude that no violation of his *Miranda* rights has been established.").

Second, the defendant claims, "Before entering the office, Mr. Youngeman was subjected

to security measures.   His belongings physically searched and subjected to xray.   He was required take all the items out of his pockets, remove his belt, and pass to through a metal detector." Mot. at 5.   But these are merely standard security measures that are in place in many federal, state, or local government offices.   *See United States v. Ambrose*, 668 F.3d 943, 956 (7th Cir. 2012) ("Those measures . . . are not indicative of custody to a reasonable person because the security restrictions were uniformly applied.").   Going through security screening does not make a reasonable person feel in custody, any more than they would feel in custody going to the airport, a courthouse, or a tour of the White House or U.S. Capitol.[6]   *See United States v. Budd*, 549 F.3d 1140, 1146 (7th Cir. 2008) (explaining that security restrictions "are not extraordinary circumstances, especially in light of the fact that [the defendant] agreed to meet at the police station.").   Indeed, if the defendant's claim is to be credited as dispositive, then thousands of baseball fans would be in custody when they walk into Nationals Park.

Finally, the defendant claims, "Mr. Youngerman was not told he would be free to leave at any time, or at the end of the interrogation."   Mot. at 5.   Even assuming this is true, a reasonable person in the defendant's position would have understood they were free to leave under the circumstances.   The defendant had first been approached at his home.   He then voluntarily came to the FBI to speak with the interviewing agent.   When he arrived, he gave his name, and was not arrested or otherwise detained.   Instead, he was told that the case agent would reach out to him.

---

[6] Although the defendant broke into the U.S. Capitol building in a manner that bypassed all its security protocols, the defendant is undoubtedly familiar with the fact that government buildings frequently require security screening, including x-ray screening.   The defendant's claim that he did not believe he could leave the FBI's office because he underwent security screening does not hold up to even the most forgiving scrutiny.   In any event, it is not the defendant's subjective beliefs that matter, but those of a reasonable person.

When she did, an interview was scheduled at a time convenient to the defendant, at the FBI's Field Office.   Moreover, as discussed above, nothing about the circumstances of the interview militates in favor of a reasonable person to believe that they were no longer free to leave.   Nothing about these circumstances indicates any level of coercion.

Because the defendant has failed to carry his burden of showing he was in custody during his June 28, 2021 interview, his motion to suppress should be denied.

## II.     The July 25, 2023 Interview Was Conducted Following Valid *Miranda* Warnings and with the Defendant's Consent.

When the defendant spontaneously invoked his right to counsel after he was arrested, he was not questioned further until he had voluntarily initiated communications with law enforcement and waived his rights.   "[A]n accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."   *Edwards*, 451 U.S. at 484–85.   "This [i]s in effect a prophylactic rule, designed to protect an accused in police custody from being badgered by police officers." *Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983); *see also Montejo v. Louisiana*, 556 U.S. 778, 787 (2009).   In assessing whether the defendant has reinitiated exchanges or communications, with the police, "we ask not what the suspect intended to do, but what intention the police officer could reasonably have interpreted the suspect's statements—even if ambiguous—to evince, without any legal presumption one way or the other."   *United States v. Straker*, 800 F.3d 570, 623 (D.C. Cir. 2015) (quoting *Bradshaw*, 462 U.S. at 1045–46) (cleaned up).

Here, following a conversation with and on the advice of his father, the defendant decided to answer certain questions from the FBI.   Notably, the FBI did not jump immediately into the

interview.   Instead, the FBI, prudently, sought to clarify the defendant's intention.[7]   *See United States v. Blake*, 571 F.3d 331, 339 (4th Cir. 2009) ("[I]n determining whether police conduct is the functional equivalent of interrogation, the intent of the police, although not the focus, can be relevant to the determination.").   The FBI reiterated to the defendant, it is "totally your right" not to answer questions.   Defense Exhibit A.   The agent sought to clarify the defendant's wishes: "Then after your conversation with dad, kind of seemed like you were—dad said to give a little bit of information."   *Id.*   The defendant responded, "I'll give a little bit."   *Id.*   The agent confirmed, "So you're willing to speak to us, even after you originally said—."   *Id.*   The defendant responded, "Yeah."   *Id.*   The agent again reiterated, "if you don't want to answer any questions totally your right to do so."   *Id.*   She stated again—clarifying for a third time over the course of approximately one minute—"You don't have to."   *Id.*   Accordingly, even before being transferred to the police station for the interrogation to begin, the defendant's rights were repeatedly reiterated to him, and he plainly understood them.   *See Bradshow*, 462 U.S. at 1046 (considering in an *Edwards* waiver that the police officer "reminded the accused that 'you do not have to talk to me'" and questioned the accused "only after the accused told him that he 'understood'"); *United States v. Jones*, 142 F. Supp. 3d 49, 62 (D.D.C. 2015) ("There is no indication that Detective Hain badgered Jones into discussing the incident.").   Under these circumstances, the subsequent interrogation was appropriate and not violative of *Edwards*:

---

[7]   The circumstances here are also notably similar to those in *Van Hook v. Anderson*, 488 F.3d 411 (6th Cir. 2007).   There after the defendant in that case had been arrested and invoked his right to counsel, law enforcement learned, through a conversation with a defendant's mother, that the defendant would be willing to talk.   *Id.* at 426.   The Sixth Circuit there found it appropriate for law enforcement to "inquire whether the suspect was re-initiating communication."   *Id.* at 428. (alteration omitted) (quoting *United States v. Michaud*, 268 F.3d 728, 735 (9th Cir. 2001)).   "This was enough to justify a limited inquiry to confirm or disaffirm that belief."   *Id.*

"Simply stated, a defendant—even if he has asserted the right to counsel—may choose to reinitiate contact with the police so long as the government does not coerce him into doing so." *United States v. Alexander*, 447 F.3d 1290, 1294 (10th Cir. 2006). Here, the defendant, on his own and with the advice of a third party, chose to reinitiate communications with law enforcement.

But even after the defendant has reinitiated communications with the police, "the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." *Bradshow*, 462 U.S. at 1044. Here, the record is clear: after being taken to the police station, the defendant was uncuffed, and agents repeatedly reiterated his constitutional rights. After engaging with the agents, he signed an Advice of Rights form indicating he understood his rights and was nonetheless willing to answer questions without an attorney present. *See* Government Exhibits 1 & 2. While the defendant chose to ignore this colloquy in his factual recitation, the defendant was given a *Miranda* advisement, and, subsequently, reiterated his willingness to answer questions without an attorney. As *Miranda* holds, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444. "[A]fter such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement." *Id.* at 479. These rights are expressly noted in the Advice of Rights form. *See* Government Exhibit 2. The defendant signed that form, *id.*, and waived these rights in the recorded interview, *see* Government Exhibit 1 (1:53–3:40).

"The waiver inquiry has two distinct dimensions: waiver must be 'voluntary in the sense

that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Berghuis*, 560 U.S. at 382–83 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). Here, the defendant's waiver, when he decided to answer certain questions—to, as the defendant said, "give a little bit"—reflected a nuanced decision consistent with a clear understanding of the nature of his rights. Specifically, the defendant answered questions about his planning for January 6, 2021, his travel to Washington, D.C., and his attendance at the "Stop the Steal" rally at the National Mall. But when he reached questions regarding the most incriminating part of his experience in Washington, D.C.—when he breached Capitol grounds, climbed a wall at the Capitol, and broke into the building—he declined to answer. *See* Government Exhibit 1 (24:05–24:53; 27:01–27:45). The defendant was clear about the nature of his invocation—that he did not want to answer any questions about what happened after he walked to the Capitol building. When asked what happened next, the defendant said, "from there, I think that part I would want, would rather have an attorney present." Government Exhibit 1. A special agent sought to clarify this ambiguous response: "Do you not want to speak further or just that question?" *Id.* The defendant responded, "That question." *Id.* Another special agent reiterated, "Yeah, any time you don't want to answer a certain question, just tell us." *Id.* His requests were honored.

The defendant's selective refusal to answer questions without an attorney does not defeat his waiver of his *Miranda* rights with respect to the statements he did make. At no point during the defendant's interview did he refuse to give a statement or unambiguously invoke his right to remain silent. *See Berghuis*, 560 U.S. at 381–82. An ambiguous colloquy is not a sufficient

invocation of the defendant's right to remain silent.   The Supreme Court requires "an unambiguous invocation of Miranda rights" such that it "'avoid[s] difficulties of proof and . . . provide[s] guidance to officers' on how to proceed in the face of ambiguity."   *Id.* at 381 (quoting *Davis*, 512 U.S. at 458–59).   If an ambiguous act, omission, or statement could require police to end the interrogation, "police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression."   *Id.* at 382.

Moreover, the defendant does not—and could not realistically—contest the voluntariness his statements to the police in his July 25, 2023 interview.   When reviewing voluntariness and possible coercion, the Court must look to the totality of circumstances, including both the characteristics of the accused and the details of the interrogation.   *See Bustamonte*, 412 U.S. at 226.   The Supreme Court has held that the ultimate question is whether the suspect's "will [has been] overborne" by "coercive police activity."   *Connelly*, 479 U.S. at 167, 178 n.2 (1986); *see also Baird v. United States*, 851 F.2d 376, 382 (D.C. Cir. 1988).   The focus is on whether the confession was obtained in a manner "so offensive to a civilized system of justice that they must be condemned."   *Miller v. Fenton*, 474 U.S. 104, 109 (1985).   Consequently, police coercion is a "necessary predicate" to a finding of involuntariness.   *Connelly*, 479 U.S. 157 (1986); *see also United States v. Stadfeld*, 689 F.3d 705, 711 (7th Cir. 2012); *United States v. Smith*, 606 F.3d 1270 (10th Cir. 2010); *United States v. Van Metre*, 150 F.3d 339, 348 (4th Cir. 1998); *Carter v. Johnson*, 131 F.3d 452 (5th Cir. 1997); *Henderson v. Norris*, 118 F.3d 1283, 1288 (8th Cir. 1997).   It has long been the rule that the mere fact that an accused is in custody and subjected to police questioning is not sufficient to raise a voluntariness issue.   *See United States v. Bernett*, 495 F.2d 943, 956 (D.C. Cir. 1974).   Rather, something besides custody and ordinary questioning must

come into play.  *Id.*  Here, the defendant does not allege any "coercive pressures" forced the statements made during the interview.  Instead, the defendant only complains that he was questioned after he initially invoked his right to counsel.  But the defendant was questioned only after telling agents he was willing to "give a little bit," even after being reminded of his prior invocation.  When the defendant said he did not want to answer questions, that was honored.  The full recordings show agents that were scrupulously attentive to and honoring the defendant's rights in the context of partial and ambiguous invocations.

That the defendant today regrets his decision is not the basis for a motion to suppress.  *See Van Hook v. Anderson*, 488 F.3d 411, 428 (6th Cir. 2007) ("The Constitution protects a suspect from official coercion—it does not protect a suspect from himself or his [parent].").  Likewise, the defendant's declaration, ECF No. 35, is of no consequence.  His subjective feelings, even if the defendant is to be believed, are not the proper inquiry.  *United States v. Suchit*, 480 F. Supp. 2d 39, 59 (D.D.C. 2007) ("[I]n the absence of some coercive police action that exploits a person's mental state, defendant's subjective fears of retaliation from other suspects cannot support a finding of involuntariness.").  Instead, the focus is on "governmental coercion," and here there is none.  *Id.* (quoting *Connelly*, 479 U.S. at 170); *see Connelly*, 479 U.S. at 164 ("[A] defendant's mental condition, by itself and apart from its relation to official coercion," cannot "dispose of the inquiry into constitutional 'voluntariness.'").  But, even if the Court is inclined to consider the defendant's claimed subjective feelings, it should not rely on a declaration.  The defendant has already demonstrated a willingness to lie when he thinks it will get him out of trouble.  As in his motion, the defendant omits from his declaration the fact that he signed an Advice of Rights form during his July 25, 2023 interview.  If he wants the Court to take his word for it as to his subjective

feelings, he should submit to cross examination.   In cross examination, the defendant will put his credibility at issue, including his record of false statements and his motive to lie.

Because the defendant initiated further communications with law enforcement, and then subsequently knowingly, intelligently, and voluntarily waived his rights under *Miranda*, his July 25, 2023 statements should not be suppressed.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the defendant's motion to suppress be denied.   Because none of the defendant's arguments raise a factual dispute that would give rise to an evidentiary hearing, the United States submits that the motion should be denied without an evidentiary hearing.   However, to the extent the Court sets an evidentiary hearing, the United States requests a date between July 17 and July 24, or in August 2024, given conflicts in the schedule of the FBI Special Agent present for both interviews of the defendant.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:      */s/ Anthony W. Mariano*
ANTHONY W. MARIANO
MA Bar No. 688559
Trial Attorney, Detailee
Capitol Siege Section
United States Attorney's Office
for the District of Columbia
601 D Street N.W.
Washington, D.C. 20530
(202) 476-0319
Anthony.Mariano2@usdoj.gov

25